[No. 33228.   Department Two.   November 25, 1955.]

GEORGIA-PACIFIC PLYWOOD COMPANY, *Respondent*, v. THE
DEPARTMENT OF LABOR AND INDUSTRIES, *Defendant*,
LIEF T. RISE, *Appellant*.[1]

*Foster & Foster*, for appellant.

*Brodie & Fristoe*, for respondent.

HILL, J.—This is, by the workman's choice, an aggravation case, in consequence of which he has assumed what seems a totally unnecessary, difficult, and perhaps impossible burden of proof.

The workman filed a claim August 14, 1947, for the occupational disease of dermatitis due.to exposure to glue, and fixed the date of August 4, 1947, as the date the disease first bothered him. He was employed at that time by the Washington Veneer Corporation (which has since been merged with the Georgia-Pacific Plywood Company, respondent here) as a sheet turner, which brought him into close proximity to and in occasional contact with the glue used as a binder in making plywood.

His claim was allowed by the department of labor and industries, and he received treatment and compensation for

[1] Reported in 290 P. (2d) 718.

time loss. He was off work from August 8, 1947, until November 6, 1947, and when he returned to work he was, at his doctor's suggestion, given outside employment, which terminated March 27, 1948. Eleven days later, April 8, 1948, he was employed by the St. Paul and Tacoma Lumber Company at his former occupation of sheet turner and, as the trial court found, performed "substantially the same kind of work with the same kind of materials as was involved in his former employment . . . as a sheet turner."

The department did not close the claim until January 6, 1950. (This is a stipulated date; the actual closing date was June 6, 1950, as clearly appears from the copy of the closing order, which is made a part of the record.) The order stated that:

". . . this claim has remained open for action as indicated and the record shows that treatment is no longer necessary and there is no permanent partial disability."

The workman had an attack of exfoliative dermatitis in April, 1951. He had at that time worked for the St. Paul and Tacoma Lumber Company for three years.

An application by the workman to reopen the claim on the ground of aggravation, apparently dated October 4, 1951, was received by the department on October 7, 1951. The department denied the application by order dated November 13, 1951, but later reconsidered. Claimant was examined by a commission of three doctors in December, 1951, and was hospitalized at the expense of the medical aid fund from December, 1951, to June, 1952. The supervisor of industrial insurance issued an order July 14, 1952, reopening the claim effective October 4, 1951. Washington Veneer appealed to the board of industrial insurance appeals from that order because "the claimant's condition now and as of October 4th, 1951, is not related to his alleged injury of August 4th, 1947, but due to other causes." (The "alleged injury" is the occupational disease which began bothering the workman on that date.)

The medical evidence before the board suggests three possible causes of the workman's condition at the time he asked for a reopening of his claim on the basis of aggravation: (1) penicillin sensitivity, (2) contact with plywood glue, and (3) psoriasis.

Dr. T. R. Ingham testified that he believed that the workman's dermatitis in October, 1951, was not caused by glue poisoning but was the result of a penicillin sensitivity which he traced back to 1946 and 1947. The history, as he gave it, was that the workman had had a hernia condition which had been accepted by the department of labor and industries as an industrial injury in a claim against a former employer, the Sam B. Smith Company. In 1947, while the workman was employed by Washington Veneer, Dr. Ingham, under authorization by the department, repaired the hernia. During the post-operative period, exfoliative dermatitis developed, traceable directly to sensitivity to penicillin. Dr. Ingham conceded that the workman was not employable but emphasized that his condition was due not to glue poisoning but to a penicillin sensitivity that dated back to the treatment following the hernia repair.

Dr. C. V. Quevli, who had the workman under his care in a hospital from December, 1951, to June, 1952, was very definitely of the opinion that the workman had an exfoliative dermatitis due to plywood glue. If we correctly interpret Dr. Quevli's testimony, it was his belief that the workman had an allergy to plywood glue and that his condition at the time he was under Dr. Quevli's care was due to his contact with such glue.

Dr. S. E. Light examined the workman September 24, 1947, and again June 30, 1953. His diagnosis was psoriasis (which concededly the workman had and which had no industrial causation). Dr. Light gave reasons why he did not believe the workman's condition was due to either penicillin sensitivity or glue poisoning. Neither Dr. Ingham nor Dr. Quevli attached any importance to the existence of the psoriasis.

The board sustained the order of the supervisor reopening the claim, and Washington Veneer appealed to the superior

court. The superior court found that the workman was suffering from a penicillin sensitivity or exfoliative dermatitis, but that he had failed to prove that the condition for which he was seeking the benefits of the workmen's compensation act "resulted from or was an aggravation of the workman's condition prior to August 4, 1947." The workman appeals to this court, and the department assumes the role of disinterested spectator.

A very narrow issue is actually presented on this appeal, *i.e.*, Did the workman prove an aggravation of the dermatitis for which his claim was closed January 6, 1950, between the terminal dates of the aggravation period? However, before we come to a consideration of that issue, we think attention should be directed to the matter of primary consideration, which has become obscured through the procedural handling of this matter, *i.e.*, the right of the workman to treatment and time-loss payments for the condition which is conceded to have existed in October, 1951, and thereafter.

It was never intended that, when a workman's right to the benefits of the workmen's compensation act on one basis or another is clear, he should have to make a binding election between the possible causes of his condition. If the workman had exfoliative dermatitis when he filed his application to reopen the former claim because of aggravation in October, 1951, it would seem that, whether his condition was an aggravation of the dermatitis originally contracted by contact with glue in 1947 while he was employed by Washington Veneer, or was the result of his contact with glue while employed by the St. Paul and Tacoma Lumber Company was (a) a very difficult if not impossible matter to determine and, (b) in the final analysis, a matter of no concern to the workman, but (c) a matter for the employers concerned and the department of labor and industries to determine or, if need be, to litigate. The workman could have avoided this burden by filing a claim for occupational disease based upon his employment with the St. Paul and Tacoma Lumber Company and, in the alternative, for the

reopening of his former claim because of aggravation. He would be entitled to the same benefits in either event.

In *Kralevich v. Department of Labor & Industries* (1945), 23 Wn. (2d) 640, 642, 161 P. (2d) 661, we held that a claimant was not limited to a claim of aggravation made inadvertently when the department

". . . was nowise misled, nor did it suffer damage because of the matters referred to. . . . Hearings before the department are not controlled by technical rules."

When the department of labor and industries reopened the claim because of the claimed aggravation, it had the report of Dr. Quevli concerning his treatment of the workman from December, 1951, to June, 1952. Whether it also had a report from Dr. Ingham prior to that time and knew of the possibility of penicillin sensitivity as a causative factor, does not appear from the record, although it does appear that it was at Dr. Ingham's suggestion that the three-doctor commission (which included Dr. Quevli) was appointed. It is our opinion (but clearly *obiter*) that the department was in no sense misled, nor did it suffer any damage by reason of the workman's application for benefits on the basis of aggravation of the prior occupational disease rather than on the basis of an original claim, inasmuch as the department had knowledge of the circumstances through Dr. Quevli's report.

We also feel that the board of industrial insurance appeals failed to deal adequately with the incongruous situation here presented. We recognize that RCW 51.52.070 (Laws of 1951, chapter 225, § 7, p. 685) requires one who appeals to the board to include in the notice of appeal every issue to be considered by the board, and that, if the only issue presented is aggravation, the board may be limited to that issue (as was its predecessor, the joint board of the department of labor and industries) regardless of the fact that the evidence may cover a wide range. *Nagel v. Department of Labor & Industries* (1937), 189 Wash. 631, 66 P. (2d) 318; *Karlson v. Department of Labor & Industries* (1946), 26 Wn. (2d) 310, 173 P. (2d) 1001.

Nevertheless, as soon as the record or the evidence before the board demonstrated that the workman's right to benefits under the act did not depend upon which of two or more employments (with Sam B. Smith Company, Washington Veneer Corporation, or St. Paul and Tacoma Lumber Company) was the cause of his condition, the board should have taken action on its own motion to bring in all parties interested in the issue of causation. What defenses any of the employers might raise (such as the statute of limitations, or the effect of the closing order of January 6, 1950, as *res judicata* of the issue of causation) would be for the consideration of the board. It is conceded that RCW 51-.52.095 (Laws of 1951, chapter 225, § 10, p. 686) does not specifically empower the board to bring in the additional parties necessary to a determination of an issue before it; however, if the board does not have the implied power so to do, it should at least endeavor to get all interested parties before it on a voluntary basis.

If it be determined that the workman has failed to prove aggravation and the application to reopen his claim is denied for that reason, and he then files a claim based upon his employment with the St. Paul and Tacoma Lumber Company, he will be confronted with RCW 51.08.140 (Laws of 1951, chapter 236, § 1, p. 744), providing that claims for occupational disease, to be valid and compensable, must be filed within one year following the date the claimant has notice from a physician of his occupational disease. Should that hurdle be successfully surmounted, he could be confronted, on an appeal by the St. Paul and Tacoma Lumber Company, with the contention that his condition is really an aggravation of an earlier ailment (and the present case would not be *res judicata* so far as that company is concerned). The result might be a holding that the workman had failed to prove that his dermatitis was the result of his work for the St. Paul and Tacoma Lumber Company. He could thus be deprived of benefits to which he is entitled. Such a dire result is always possible where the workman, the department, and the board of industrial insurance ap-

peals permit or acquiesce in the piecemeal presentation of the issue of causation as between employers.

We have criticized the workman, the department, and the board with a full realization that it is much easier to second-guess than it is to make decisions under pressure, and also with an appreciation of the fact that the decisions made by the department (through the supervisor of industrial insurance) and the board, *i.e.*, that the original claim should be reopened because of aggravation, reached the proper end result—treatment and time-loss payments for the workman.

The issue before the superior court was identical with that before the board of industrial insurance appeals, *i.e.*, whether or not the workman's dermatitis resulting from his occupational exposure prior to August 4, 1947, became aggravated between January 6, 1950 (the date of the order closing his 1947 claim), and July 14, 1952 (the date of the order reopening his claim). *Karniss v. Department of Labor & Industries* (1952), 39 Wn. (2d) 898, 239 P. (2d) 555; *Kleven v. Department of Labor & Industries* (1952), 40 Wn. (2d) 415, 243 P. (2d) 488.

We have assumed, in this statement of the question, that the department's closing order of January 6, 1950, not appealed, is *res judicata* as to the cause of the dermatitis for which the workman received treatment and compensation for time loss under the claim closed on that date, and that his work for Washington Veneer was the cause thereof. This is in accord with the workman's contention on that point. We have assumed, also, that the closing order precludes Washington Veneer or its successor in interest from now urging that penicillin sensitivity was the cause of that condition, rather than exposure to plywood glue. However, that order does not preclude Washington Veneer or its successor in interest from urging that no aggravation of the earlier condition, whatever its cause, has been established.

Neither the board of industrial insurance appeals nor the superior court gave any weight to Dr. Light's testimony, and for that reason we ignore it. Drs. Ingham and Quevli, while in disagreement as to whether penicillin sen-

sitivity or plywood glue was the cause of the dermatitis in October, 1951, agree that there was an exfoliative dermatitis and that the workman was unemployable when his claim was reopened. One traces the cause directly to employment (we assume the most recent) involving contact with plywood glue, and the other to a penicillin sensitivity which first manifested itself as a result of treatment given for an industrial injury sustained in the course of employment by the Sam B. Smith Company, which antedated the workman's employment by Washington Veneer. Under the testimony of either, this workman is entitled to treatment and time-loss payments (saving consideration of limitation statutes), but neither establishes an aggravation of the occupational disease of dermatitis due to contact with glue dating back to August 4, 1947, the claim for which was closed January 6, 1950, nor, in fact, an aggravation of that particular dermatitis, whatever its cause. We must therefore conclude that the superior court was correct in finding that no aggravation was established and that the evidence does not sustain the findings and order of the board of industrial insurance appeals.

It is not our function to outline how the workman and the department shall proceed in dealing with what we have referred to as "the matter of primary consideration" (p. 896), but we have endeavored to make it clear that what we here decide is not in any sense determinative of the workman's right to benefits under the workmen's compensation act.

Judgment affirmed.

HAMLEY, C. J., MALLERY, and FINLEY, JJ., concur.

ROSELLINI, J. (dissenting)—The decision of the board of industrial insurance appeals, in part, reads as follows:

"The issue presented by the employer's appeal is whether or not the workman's condition resulting from his occupational exposure prior to August 4, 1947, became aggravated between January 6, 1950, and July 14, 1952. *Karniss v. Department of Labor and Industries,* 39 Wn. (2d) 898; *Kleven v. Department of Labor and Industries,* 40 Wn. (2d) 415.

"The workman stated that after August 14, 1947, he was

under treatment for eleven weeks for his skin condition. He returned to work November 6, 1947. He was then given employment outside the plant away from any contact with glue. The workman left this employment in March, 1948. He was then employed from April 8, 1948, until April, 1951, as a sheet turner in a 'cold' glue operation in another plant. The workman stated that in about April, 1951, he had a recurrence of his skin condition on his legs. He stated that he was hospitalized at the Western State Hospital for two months where he was under treatment for his skin condition. He was under observation and treatment at that hospital until October, 1951. He then applied to reopen his claim for aggravation of his condition. On November 16, 1951, the workman was examined by Dr. T. R. Ingham for a breaking out on his hands, arms and legs. Dr. Ingham recommended that the workman be given a further examination by a commission of skin specialists. He was examined by a commission of doctors including Dr. Quevli December 19, 1951. He was hospitalized by Dr. Quevli and stayed in the hospital under his care and treatment from December, 1951, to June, 1952. The workman stated that his skin condition improved under this treatment. He then returned to the care of Dr. Ingham in July, 1952. He stated that Dr. Ingham has been treating him with cortisone which keeps his skin fairly well although he has not yet been able to return to work.

"The workman's medical testimony was given by Dr. T. R. Ingham and Dr. C. F. Quevli, two of his attending physicians. The employer's medical witness was Dr. S. E. Light.

"Dr. Ingham stated that he first examined the workman on July 6, 1946, an employment physical examination, at the request of the employer. He noted minor patches of psoriasis on his elbows and knees and a right indirect inguinal hernia. On July 31, 1946, he removed a wood sliver containing glue embedded in the palm of the workman's left hand. Dr. Ingham repaired the workman's hernia on March 22, 1947. On April 26, 1947, he treated the workman for an acute tenosynovitis inflammation of the left wrist which he believed was a complicating result from the sliver embedded with glue of the previous July. Dr. Ingham stated that penicillin was given and a mild exfoliative dermatitis followed but the rash improved when the penicillin was discontinued. He described exfoliative dermatitis as an inflammatory skin condition in which the skin becomes red, angry and painful and sloughs off. Dr. Ingham next ex-

amined the workman on November 16, 1951. He gave Dr. Ingham a history of being hospitalized in August, 1947, for generalized dermatitis due to glue poisoning and given additional penicillin. The workman had a violent exfoliative dermatitis that required extensive medical care. Dr. Ingham stated that when he examined the workman on November 16, 1951, he was not employable because of active exfoliative dermatitis. Dr. Ingham recommended an examination by a skin specialist to consider further treatment. He next saw the workman in July, 1952, and has had him under treatment since that time. Dr. Ingham stated that at the time of his last examination on February 3, 1953, the workman's skin had quieted down but he is still unemployable because of the condition of his skin. Dr. Ingham was of the opinion that the workman had received a shot of penicillin for some minor medical ailment just before his hospitalization in August, 1947, for glue poisoning. Thereafter, while hospitalized for glue poisoning, the workman was given a pencillin injection that resulted in a permanently sensitized and damaged skin from penicillin reactions. Dr. Ingham was therefore of the opinion that the workman's skin sensitivity developed in the course of his treatment for an industrial condition. Disabilities and conditions arising from treatment are compensable as resulting from the original condition or disability. *Ross v. Erickson Construction Company,* 89 Wash. 634; *Carmichael v. Kirkpatrick,* 185 Wash. 609.

"Dr. Ingham found no significant change in the psoriasis condition of the workman at the time and therefore did not consider the psoriasis condition as a factor in this case.

"Dr. C. F. Quevli was called as a witness by the workman. He testified he first examined the workman December 19, 1951. He diagnosed the condition as exfoliative dermatitis. Dr. Quevli stated he had the workman under treatment for his skin condition in the hospital from December, 1951, to June, 1952. He stated that the condition was greatly improved by June, 1952. Dr. Quevli was of the opinion, based on his experience with similar skin conditions, that the workman's exfoliative dermatitis was due to contact with glue in the course of his work.

"Dr. S. E. Light gave testimony on behalf of the employer. He examined the workman September 24, 1947, and June 30, 1953. Dr. Light stated that his diagnosis on September 24, 1947, was severe subacute psoriasis, confluent on hands, forearms, and legs. On June 30th, 1953, Dr. Light stated the psoriasis was all cleared except for one scaling

spot on the inner side of the left knee. He stated he saw nothing about the workman's condition on either examination to suggest glue poisoning. Dr. Light stated that the workman did not have exfoliating dermatitis at either of his examinations, just psoriasis. He did, however, state that psoriasis is prone to develop into exfoliating dermatitis. Dr. Light admitted that pencillin sensitivity can produce an exfoliative dermatitis and psoriasis. He had a history of several treatments with pencillin without reaction into exfoliating dermatitis. Dr. Light also had a history of the same exposure to glue after the first skin eruption without skin irritation. Dr. Light said alcoholic excesses and psychotic episodes are factors in the exacerbation of psoriasis into exfoliating dermatitis. In this case he stated the workman had mental upsets and alcoholic excesses were suspected but not proven.

"All the medical witnesses are in agreement that contact with glue can bring about a skin irritation and dermatitis. They also agree that a sensitivity to pencillin can produce exfoliative dermatitis.

"Drs. Ingham and Quevli, the attending physicians, are agreed on the diagnosis that the workman had an active exfoliating dermatitis when they treated him. They were also of the opinion that the workman was unable to follow a gainful occupation on account of the condition during the time they had had him under observation and treatment.

"They differ only upon the relationship of the workman's condition to his employment. Dr. Ingham was of the opinion that the condition of the workman's skin resulted from penicillin sensitivity changing the nature of his skin. Dr. Ingham's history was that the penicillin was given to the workman in the course of treatment for glue poisoning after August 4, 1947. He was therefore of the opinion that whether the diagnosis was glue poisoning or penicillin reaction in August, 1947, the condition resulting would be the same. Dr. Quevli who had the workman hospitalized under treatment for six months, during the period in issue, was of the opinion that his glue exposure brought about the exfoliative dermatitis he treated. Dr. Light did not see the workman at any time when he had active exfoliative dermatitis. Dr. Light's opinion that penicillin was not a factor in the exfoliating dermatitis is based on an incorrect history from another physician of penicillin injections without reaction. The uncontradicted testimony of Dr. Ingham, the original attending physician, shows a reaction after penicillin injec-

tion to such degree that he placed a notation on his hospital chart ordering no more penicillin for this patient.

"A doctor who has attended a patient for a considerable time for the purpose of treatment is better qualified to give an opinion as to the patient's disability than a doctor who has seen and examined him once. *Spalding v. Department of Labor and Industries*, 29 Wn. (2d) 115. Special consideration should be given the opinion of the attending physician. *Smith v. Department of Labor and Industries*, 180 Wash. 84.

"The board, therefore, accepts the opinion of the two attending physicians that the workman had an aggravation of his condition, namely exfoliative dermatitis, resulting from his occupational exposure in 1947."

According to Dr. Ingham's testimony, the penicillin sensitivity was first manifested when the appellant was treated for an infection resulting from the sliver he received in his left hand while employed by the Washington Veneer Corporation, predecessor of the respondent. The respondent admits that he was so employed, and, this being the case, if we accept the doctor's testimony, as the board did, the aggravated condition is traceable to an injury occurring while the appellant was in the respondent's employ.

RCW 51.52.115 provides:

". . . In all court proceedings under or pursuant to this title the findings and decision of the board shall be *prima facie* correct and the burden of proof shall be upon the party attacking the same. . . ."

The record amply sustains the decision of the board of industrial insurance appeals, and the employer has not sustained the burden of proof to overcome the decision of the board; therefore, the judgment of the trial court should be reversed and the decision and order of the board of industrial insurance appeals should be reinstated.